UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**COLLEEN CAHILL**,                    Case No. 1:11 CV 2207

      Plaintiff,                 Judge Patricia A. Gaughan

    v.                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

      Defendant.                 Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Colleen Cahill seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated October 17, 2011). For the reasons given below, the undersigned recommends remanding the Commissioner's decision denying benefits.

### BACKGROUND

On October 20, 2007, Plaintiff filed applications for DIB and SSI alleging a disability onset date of March 20, 2007. (Tr. 128, 132). Her claims were denied initially (Tr. 91, 95) and on reconsideration (Tr. 100, 107). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 113). Born January 21, 1958, Plaintiff was 52 years old when the hearing was held on May 11, 2010. (Tr. 33, 128). Plaintiff (represented by counsel), a medical expert, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 27, 33).

Medical History

Prior to her alleged onset date, Plaintiff frequently presented to physicians complaining of a number of symptoms. In 2000, test results showed Plaintiff's heart, lungs, and brain were normal. (Tr. 516–17, 520). In the years leading up to her alleged onset date of March 20, 2007, Plaintiff often complained of fatigue (Tr. 232, 263, 269, 382, 441, 469, 472, 802), dizziness (Tr. 324, 338, 449, 469, 472), back and rib cage pain causing a squeezing sensation around her chest (Tr. 271, 285, 324–25, 331, 333, 349, 361, 363, 447, 449, 459, 465, 469, 472), multiple falls (Tr. 285, 324, 331, 333, 402), distorted vision (Tr. 255, 263, 449, 469), feeling an electrical shock sensation (Tr. 271, 276, 805), swelling (Tr. 338, 345, 441, 469), difficulty breathing (Tr. 319, 324, 441, 447), depression (Tr. 361), chest pain and discomfort (Tr. 325, 313, 349, 358), headaches (Tr. 258, 263, 268, 271, 276, 441), weakness (Tr. 269, 276, 345, 802, 804), numbness (Tr. 263, 269, 276, 802, 804), difficulty swallowing (Tr. 469), and memory problems (Tr. 263).

Test results between 2001 and 2006 were generally normal. An August 2001 CT scan showed Plaintiff's lungs were clear; there was no air or free fluid in her abdomen or pelvis; and there were no pathologically enlarged lymph nodes. (Tr. 512). A 2001 MRI showed cervical spondylosis and a minimal posterior disk bulge at T6-7 "which produce[d] no significant central canal stenosis or neural faraminal stenosis." (Tr. 509). Records show Plaintiff had been diagnosed with COPD, but test results showed no acute pulmonary disease. (Tr. 439, 448, 408). A 2003 spine x-ray showed no fracture or dislocation, though there was mild kyphosis of Plaintiff's cervical spine. (Tr. 402, 501, 504). A 2004 x-ray of Plaintiff's chest and dorsal spine showed no cardiopulmonary abnormality and only minimal degenerative changes in her dorsal spine. (Tr. 499). An EGD performed in 2005 was normal except for evidence of erosive gastritis. (Tr. 351). A few biopsies were taken, but the

results were negative. (Tr. 354). X-rays were also unremarkable in June 2005. (Tr. 333, 498). Plaintiff was referred for stress testing in September 2005, but the findings were normal. (Tr. 316, 321). On October 18, 2005, Plaintiff complained of back pain after falling, but Plaintiff's gait was "ok", and an x-ray of Plaintiff's spine showed minimal degenerative disk disease throughout the dorsal spine, no fractures, a well-aligned lumbar spine, and only minimal scoliosis. (Tr. 284–85, 497).

In December 2005, Dr. Monica Urban referred Plaintiff for an MRI to rule out multiple sclerosis (MS) following Plaintiff's continued complaints of weakness, numbness, headaches, and a zapping electrical sensation. (Tr. 276, 280). Plaintiff went to the emergency room (ER) in January 2006 complaining of constant headaches, lower back pain, and "mild electrical zap[s]" on her right side, increasing in frequency and duration. (Tr. 271, 273). She also reported stuttering and dropping things. (Tr. 273). Plaintiff's physical examination and tests were normal and she "d[id] not appear ill at all." (Tr. 273). Her discharge diagnosis was right sided paresthesias of unclear etiology. (Tr. 271–72, 274, 851). An MRI of Plaintiff's brain performed January 11, 2006 showed "[n]onspecific periventricular white matter changes in the frontal lobes, particularly on the left", and later that month Dr. Urban referred Plaintiff to a neurologist. (Tr. 268, 494). Plaintiff continued to experience muscle weakness, numbness, and ongoing fatigue, but was able to perform her activities of daily living. (Tr. 802–03). On January 31, 2006, Plaintiff saw neurologist Dr. Deborah Ewing-Wilson. (Tr. 262). Plaintiff had a mildly unsteady tandem gait, but normal muscle tone, a normal neurological exam, normal strength, normal coordination, and mildly hyperactive reflexes. (Tr. 266). Dr. Ewing-Wilson believed Plaintiff likely suffered relapsing or remitting MS. (Tr. 264).

An MRI of Plaintiff's cervical spine on February 14, 2006 showed degenerative disc bulging,

3

spondylotic ridging, and "ucinate process hypertrophy producing varying degree[s] of spinal and neural foraminal stenosis at disc levels C5-C6." (Tr. 491). The MRI did not show focal disc herniation, abnormal cord enlargement, or abnormal signal intensity. (Tr. 491). Plaintiff's cerebrospinal fluid was also tested in February 2006, and it was ultimately negative for malignant cells. (Tr. 691, 699, 701, 704). On February 21, 2006, Dr. Ewing-Wilson told Plaintiff MS was most likely her diagnosis, given the results of her brain MRI. (Tr. 799–800).

In July 2006, Plaintiff went to the ER complaining of depression, difficulty multitasking, and memory problems, stating she felt she could hurt herself. (Tr. 240, 242, 776). Plaintiff was prescribed an antidepressant and instructed to follow up. (Tr. 242). Treatment notes from August 2006 indicate the abnormal MRI, but state Plaintiff "[felt] good" and Paxil improved her depression. (Tr. 237). Plaintiff had 5/5 strength and mainly normal reflexes, but she complained of mild short term memory loss. (Tr. 238). On November 29, 2006, Plaintiff complained of having a headache for several days, but her physical examination was normal. (Tr. 233, 235). Treatment notes from December 11, 2006 state Plaintiff had symptoms consistent with Lhermitte's Sign, but indicated her falling was "due to tripping on objects[,] not gait imbalance." (Tr. 765). A nurse recommended Plaintiff not drive alone while experiencing the electrical shocking feeling. (Tr. 766). Treatment notes from December 12, 2006 show Plaintiff complained of MS symptoms, including increased difficulty keeping her balance and multiple falls. (Tr. 232). Plaintiff also reported "electric like shocks in her face, chest, and right arm", along with fatigue, but she presented in no acute distress, and her neurological examination was normal. (Tr. 232).

Plaintiff saw Dr. Kent Kulow on April 16, 2007 presenting with increasing MS symptoms, including weakness and tremors. (Tr. 228–30). Plaintiff had intermittent pain under and behind her

right eye several times per week, sometimes multiple times per day, and also complained of lower eyelid tremors and blurry vision. (Tr. 229). Plaintiff fatigued easily but had no problems walking, and her memory had improved. (Tr. 229). Examination notes indicate no trouble with or loss of vision, no trouble with hearing or speech, no neck or back pains, no radicular symptoms down her arms or legs, no numbness or weakness, and no headaches. (Tr. 229). Plaintiff did report rib cage pain and high stress. (Tr. 229). Her strength was 5/5, her gait was normal, and her coordination was normal. (Tr. 230). She also had reflexes assessed as 1/4, and normal sensation. (Tr. 230). Plaintiff continued to complain of increased tremors and fatigue in April 2007. (Tr. 760). On April 20, 2007, Plaintiff was admitted to the hospital for chest pain between her shoulder blades. (Tr. 754). She felt the pain was due to stress, and notes state Plaintiff was fired one month earlier. (Tr. 755).

On January 12, 2008, Plaintiff presented to the ER complaining of weakness, rib pain, and numbness, but her CT scan was unremarkable. (Tr. 1008, 1010, 1016). On January 16, 2008, Plaintiff saw Dr. Porter for the first time in four years. (Tr. 569). Dr. Porter's treatment notes state Plaintiff had been diagnosed with MS since she last saw her. (Tr. 569). Plaintiff reported an incident in which she went to the ER because her legs would not work, she had facial numbness and difficulty swallowing, and she experienced blurred vision. (Tr. 569). She reported she still experienced facial numbness, difficulty swallowing, weakness, and fatigue. (Tr. 571). Plaintiff's gait "seem[ed] a little wavering", but she climbed onto the exam table without assistance. (Tr. 570). Dr. Porter prescribed steroid infusions and continued Plaintiff's antidepressant medication. (Tr. 570–71).

On January 28, 2008, Plaintiff saw neurologist Dr. Mary R. Rensel for a second opinion about MS. (Tr. 639). Plaintiff's symptoms were fatigue and generalized weakness; confusion/overall thought process; bilateral rib pain; balance problems; swallowing difficulties; and blurry vision. (Tr.

639). Dr. Rensel indicated Plaintiff also experienced short-term memory problems, listed Plaintiff's history of recent falls, and noted Plaintiff was currently not driving due to a judgment call. (Tr. 639–40). Plaintiff told Dr. Rensel she was unsure why she lost her previous job. (Tr. 640). She was alert, cooperative, in no distress, and able to provide a coherent history. (Tr. 640). Dr. Rensel saw no suggestion of cognitive disturbance, though there was some mild memory dysfunction. (Tr. 640).

Plaintiff's gait was normal and she could walk 25 feet in nine seconds, but she could not perform tandem walking. (Tr. 641). She could stand on either foot, but her Romberg's test was positive, meaning Plaintiff swayed while standing with her eyes closed. (Tr. 641). Dr. Rensel observed no cerebellar tremor on finger-to-nose testing, but noted Plaintiff was slow with movements. (Tr. 641). Plaintiff also had normal strength. (Tr. 641). Her deep tendon reflexes were mildly brisk with clonus in both ankles. (Tr. 641). Plaintiff's sensory exam was mostly normal, but she experienced decreased pinprick sensation on her left leg. (Tr. 641). Dr. Rensel stated the neurologic examination was "significant for mild memory dysfunction, hyporeflexia DTR's, and mild sensory abnormalities." (Tr. 642). She referred Plaintiff for physical and occupational therapy and ordered an MRI. (Tr. 642).

On February 4, 2008, Plaintiff saw Dr. Porter and reported she was doing much better after a steroid burst, but said she still was not driving. (Tr. 562). The next day, Matt Sutliff evaluated Plaintiff for physical therapy. (Tr. 632). Sutliff mentioned Plaintiff was unsure why she had been let go in March 2007 because the whole staff was let go. (Tr. 633). He observed mild impairment in Plaintiff's coordination, noting she ambulated independently, with a mildly unstable gait, stating Plaintiff had "poor righting reactions when she bec[ame] slightly imbalance[d] and then [wa]s unable to correct her balance before falling", further stating Plaintiff started to fall immediately with

6

her eyes closed. (Tr. 635). He assessed Plaintiff as having decreased balance, decreased ambulation, decreased tolerance for driving, functional activities, work activities, and stairs, and somatosensory balance deficit, but stated her rehabilitation potential was good. (Tr. 636).

The same day, Plaintiff reported to occupational therapy with James C. Ives. (Tr. 627). Plaintiff's chief complaints were fatigue, decreased cognition including attention, disorientation, confusion, short term memory problems, and dysphagia. (Tr. 628). She also complained of difficulty swallowing, choking at night, bilateral rib cage pain, and falling. (Tr. 628). Plaintiff reported she worked in management until March 2007, but was unsure why she lost her job as the "whole staff was let go". (Tr. 628). Ives stated Plaintiff is independent in meal preparation, cleaning, laundry, and money management (though she needs rest breaks for some of these activities), but needs assistance shopping and uses the grocery cart for support due to fatigue. (Tr. 628). Plaintiff's range of motion and strength were normal. (Tr. 629). Plaintiff reported she distracts easily and experiences heightened difficulty focusing in crowded or noisy environments. (Tr. 630). Plaintiff "appeared to give less than full effort when testing RUE pinch/finger strength with pinch gauge." (Tr. 630). On February 11, 2008, Plaintiff did not report any pain at occupational therapy. (Tr. 624). A cognitive assessment indicated "possible cerebral dysfunction". (Tr. 624). Plaintiff attended occupational therapy on February 18, 2008, complaining of decreased memory, attention problems, and confusion. (Tr. 621). The assessment stated Plaintiff "may have a combination of MS related cognitive deficits with anxiety/behavioral related decreased cognitive performance due to depression and other recent psychosocial stressors." (Tr. 620–21). She was interested in retraining for a new job. (Tr. 621).

At an occupational therapy driving test on February 26, 2008, Plaintiff reported weakness,

lack of coordination, or limited motion; spasms, tremors, or involuntary movements; decreased balance; tingling or numbness in her feet; pain; fatigue or poor endurance; blurred vision; problems concentrating; difficulty filtering out distractions; difficulty multitasking; forgetting new information; and forgetting how to go from one place to another. (Tr. 615). She expressed a number of concerns regarding driving. (Tr. 616). However, her functional level was sufficient and compatible with driving. (Tr. 616). During her driving assessment, Plaintiff maintained attention despite the tester using conversation, poor directions, late directions, and multiple directions as "distracters." (Tr. 618). Plaintiff stated the test occurred on a good day, noting she does not drive on bad days, and the therapist agreed she likely should not drive on bad days. (Tr. 619). Otherwise, Plaintiff could return to independent driving with no restrictions. (Tr. 619).

On March 3, 2008, Plaintiff presented to Dr. Darlene P. Floden for a neuropsychological evaluation. (Tr. 657). Plaintiff was pleasant and cooperative, with fluent speech and no significant word-finding difficulty. (Tr. 657). Her comprehension for general test instructions and conversation was intact. (Tr. 657). Plaintiff's mood was low when discussing her limitations, she appeared frustrated by testing, and she showed anxiety regarding her performance. (Tr. 657). On several indicators of test-taking effort, Plaintiff's scores suggested she was not able to put forth her best performance and Dr. Floden believed the results could underestimate her actual abilities. (Tr. 657).

Plaintiff told Dr. Floden she began experiencing cognitive difficulties at her previous job, particularly with multitasking and organization, explaining she loses her train of thought, distracts easily, has decreased thinking speed, and mild memory problems. (Tr. 658). Plaintiff also reported word-finding problems and reported getting lost while driving due to attention problems. (Tr. 658). Additionally, Plaintiff described blurred vision, numbness, low energy, fatigue, and depression. (Tr.

8

658). Dr. Floden interviewed Plaintiff's mother, who largely echoed her daughter's reports of symptoms and difficulties. (Tr. 658). It was difficult to interpret Plaintiff's weak performance on memory testing due to her test anxiety and inability to put forth maximal effort. (Tr. 659). Nevertheless, Dr. Floden was reasonably convinced Plaintiff had experienced some degree of cognitive decline. (Tr. 659). The patterns she observed were consistent with the difficulties Plaintiff described in daily life and "frequently reported in patients with multiple sclerosis." (Tr. 659). Dr. Floden advised employment with fewer cognitive demands and a more flexible schedule. (Tr. 659).

Plaintiff returned to physical therapy on March 17, 2008, reporting improved balance and no falls. (Tr. 609). Plaintiff walked 20 feet with no assistive device, no imbalance, and a normal gait pattern. (Tr. 610). She showed no imbalance or loss of balance in a number of gait tests. (Tr. 610). In fact, she was "much improved" and making "excellent progress". (Tr. 610). On March 24, 3008, Plaintiff did not do as well, complaining of shaky legs and increased facial numbness, but she could still walk 20 feet with no assistive device, no imbalance, and a normal gait pattern. (Tr. 606–07). Overall, her gait showed mild instability, but normal stride length, and treatment notes still indicated poor righting reactions. (Tr. 607). Plaintiff could not perform "Heel Walk", as her legs were shaking. (Tr. 607). Sutliff's assessment noted increased cerebellar shaking, and decreased balance and ambulation, along with decreased tolerance for driving, functional activities, and stairs, and he believed this could indicate a relapse. (Tr. 607).

Plaintiff presented to Dr. Porter on March 27, 2008 complaining of ringing in her ears and a constant "whooshing sound". (Tr. 558). She said she felt like she did with a previous MS flare, explaining she felt exhausted, and routinely felt her legs were shaky on stairs. (Tr. 559). She also reported drooling at night and feeling like she was choking. (Tr. 559). Plaintiff felt her current

medication was not helping, so Dr. Porter prescribed a "steroid burst". (Tr. 559). At physical therapy on March 31, 2008, Plaintiff reported her legs felt better after her solumedrol treatment, but still did not feel quite right. (Tr. 552). She reported compliance with her home exercise program and said she had not fallen. (Tr. 552). Plaintiff also reported left arm pain. (Tr. 552). Plaintiff still had difficulty with tandem standing and standing on one leg, but she walked on a level surface with no assistive device, no imbalance, and normal gait, and she changed walking speed without losing balance or deviating her gait. (Tr. 552–53). Overall, Plaintiff's gait showed mild instability and her balance with her eyes closed had significantly improved, but she still had difficulty with heel walking. (Tr. 553).

On April 3, 2008, Plaintiff presented to Dr. Porter and reported feeling a bit better after receiving steroid infusions, but said the relief only lasted a few days. (Tr. 549). Plaintiff's leg pain was exacerbated by a misstep on the stairs. (Tr. 549). Plaintiff was in no acute distress and her extremities were normal other than her thighs, which were tender to the touch. (Tr. 549). An MRI from the same date showed a nonspecific isolated left frontal white matter lesion. (Tr. 561). The medical record states while this is consistent with a history of MS, it is not diagnostic and could "simple (sic) reflect the subtle sequela of a remote insult." (Tr. 561).

Plaintiff attended physical therapy on April 28, 2008, reporting tiredness, pain, a ringing in her ears, and the sound of wind blowing in her head. (Tr. 1026). While Plaintiff stated she had not had any falls, she still felt unstable. (Tr. 1026). Plaintiff ambulated independently, with a mildly unstable gait; she completed tandem walking; she completed toe walking independently; and she was able to complete heel walking, but this was difficult. (Tr. 1028). Sutliff reported Plaintiff had mixed results with her objective testing, stating her performance was inconsistent. (Tr. 1028). He

10

stated she was not improving in physical therapy, and noted her balance disorder and other issues. (Tr. 1028).

Plaintiff presented to neurologist Dr. Rensel on May 13, 2008, reporting she felt better for a few weeks after her steroid bursts, but then felt weaker, fatigued, and depressed. (Tr. 1022). She also complained of pain in her back, arm, and trunk. (Tr. 1022). Dr. Rensel's notes state the isolated frontal white matter lesion on Plaintiff's MRI was not diagnostic of MS. (Tr. 1022). Plaintiff was in no distress and had no memory disturbance. (Tr. 1023). She walked 25 feet independently in under seven seconds, but could not balance or hop on each foot. (Tr. 1023). Her strength was 5/5 in all extremities, but limited by pain in some instances. (Tr. 1023–24). Dr. Rensel noted Plaintiff's neurologic symptoms were of unclear etiology, finding she could not confirm MS. (Tr. 1024).

Plaintiff saw Dr. Porter on July 12, 2008, expressing confusion about the conflicting physician opinions about whether she has MS. (Tr. 965–66). Plaintiff reported a number of symptoms, including fatigue, memory difficulties, depression, lack of stamina, feeling like the floor is coming up at her, peripheral vision problems, hearing a wind tunnel in her head, weak legs, and a burning sensation in her skin. (Tr. 966). Her cognition was slow, with word-finding difficulty, she had some reflex problems with clonus at both ankles, and her skin was hypersensitive to a light touch, but her strength was 4/5. (Tr. 966). Dr. Porter still suspected MS, but she referred Plaintiff for further neurological consultation. (Tr. 966). On July 29, 2008, MRIs of Plaintiff's cervical and thoracic spine showed no intrinsic spinal cord abnormalities, but showed disc osteophyte changes at C4-5 and C5-6, with mild ventral cord deformity. (Tr. 842).

Neurologist Dr. Sheila Rubin evaluated Plaintiff on August 25, 2008, noting Plaintiff had "[m]any symptoms, [but] few findings" and explaining, "[a]part from briskish lower extremity

11

reflexes and inconsistent sensory findings, her exam [wa]s normal", with signs of embellishment. (Tr. 958, 961). Dr. Rubin concluded Plaintiff did not meet the criteria for MS, and she believed Plaintiff was a "somaticizer." (Tr. 961). Dr. Rubin admitted there might be "a kernel of pathology to her symptoms that she embellished". (Tr. 961). On September 17, 2008, Plaintiff attended a follow-up visit with Dr. Rubin, reporting difficulty swallowing, muscle cramps in her neck, pins and needles in her right leg, loss of feeling in her leg, involuntary limb movements, choking, stamina problems, confusion, and frequent yawning. (Tr. 953). Plaintiff's gait was narrow-based and steady. (Tr. 953). Dr. Rubin suspected Plaintiff's symptoms were largely psychogenic, but evaluated her "for the very low likelihood of bulbar myasthenia to explain her reported swallowing difficulties." (Tr. 953). When Plaintiff saw Dr. Rubin on October 20, 2008, she still reported leg, arm, and eye pain, difficulty swallowing, a pulled-muscle sensation in her neck, eyelid drooping, and fatigue, but denied limb weakness and difficulty breathing. (Tr. 948). Plaintiff displayed full-strength eye closure and full shoulder strength, with no decay over repetitive testing. (Tr. 948). Lab results indicated myasthenia gravis and Dr. Rubin said Plaintiff's generalized fatigue and occasional weakness could also indicate the condition, but Plaintiff had no weakness on exam. (Tr. 948). Myasthenia gravis was ruled out a week later based on EMG findings "show[ing] no evidence of myopathy or a defect of neuromuscular junction transmission, such as myasthenia gravis" (Tr. 952).

Plaintiff presented to Dr. Rubin again on November 24, 2008, stating she was feeling better, with a higher energy level. (Tr. 942). She continued to report some symptoms including difficulty swallowing, but indicated these had improved with medication. (Tr. 942). Plaintiff also said she was "feeling really good" until she experienced increased fatigue, facial numbness, eye pain, and body pain a week earlier. (Tr. 942). Additionally, Plaintiff reported fatigue and loud snoring. (Tr. 942).

Dr. Rubin told Plaintiff there was no evidence of neurological disease. (Tr. 943). She believed Plaintiff might have sleep apnea, but noted this would not account for all Plaintiff's symptoms. (Tr. 943). Overall, Dr. Rubin thought "many of her symptoms [were] psychologically generated", and she discussed referring Plaintiff to a psychologist. (Tr. 943). Dr. Rubin also noted Plaintiff "genuinely seem[ed] to want to return to work." (Tr. 943).

Plaintiff saw Dr. Porter on February 5, 2009, stating her depression had improved with medication. (Tr. 933). She still reported weakness, "snapping in face", muscle cramps, fatigue, shakiness, and a "roaring wind tunnel sound" in both ears, but Plaintiff was "willing to see [a] psychiatrist for possible somatic manifestations of psychological stress". (Tr. 933–34).

On February 27, 2009, Plaintiff presented to Dr. Charles J. Bae for a sleep apnea consultation. (Tr. 929). Dr. Bae noted Plaintiff had been diagnosed with severe obstructive sleep apnea. (Tr. 929). On physical examination, Plaintiff moved all her extremities equally and spontaneously and her gait was normal. (Tr. 930). Dr. Bae initiated treatment with a CPAP machine, and in May 2009 Plaintiff reported the CPAP machine helped her sleep, eliminating her need for naps. (Tr. 925, 930). Further, her daytime energy had increased to the point she could mow her entire lawn, but her respiratory condition still caused fatigue and required her to take breaks. (Tr. 925).

On October 23, 2009, neurologist Dr. Gary R. Kutsikovich found an EMG showed mild-to-moderate C6/C7 cervical radiculopathy. (Tr. 1066). On December 8, 2009, Plaintiff attended counseling and reported feeling like a failure because doctors could not identify her condition, and she feared her symptoms were psychosomatic. (Tr. 1038). Plaintiff said she lost her job in 2007 due to her medical condition, explaining her employer believed MS was contagious. (Tr. 1038, 1040).

13

Plaintiff also indicated she is fatigued and unable to complete tasks, but notes suggest Plaintiff wanted to work. (Tr. 1039–40). She reported sleep problems and seizures, and had difficulty providing information due to memory loss. (Tr. 1044, 1050).

On December 18, 2009, neurologist Dr. Kutsikovich evaluated Plaintiff regarding facial twitching, altered awareness, and possible partial seizures. (Tr. 1064). Plaintiff's twitching episodes had improved on Neurontin, but her symptoms had been occurring more frequently. (Tr. 1064). Plaintiff's motor exam showed 5/5 strength with normal bulk and tone; her reflexes were 2/4 in all extremities; her sensory examination was intact to light tough; her coordination showed no ataxia; and her gait was steady. (Tr. 1064). Dr. Kutsikovich agreed Plaintiff's facial twitching with altered awareness could be consistent with a diagnosis of partial seizures. (Tr. 1064).

Plaintiff saw Dr. Elizabeth Roter for a consult on December 21, 2009, complaining of muscle aches and tightening, knee pain, facial numbness, and other various issues including skin pain. (Tr. 1070–71). She reported she generally slept well and exercised most days, but was vague about details. (Tr. 1070). It was difficult to assess Plaintiff's true strength, but her reflexes were brisk, with hyperreflexia, and Plaintiff had "FM tender pts"[1] on her thigh and leg. (Tr. 1071). Dr. Roter stated based on muscle aches and neurological symptoms, "FM appears to play a role". (Tr. 1071). On December 28, 2009, Dr. Kutsikovich's notes described EEG findings that "may be epileptiform in nature." (Tr. 998). A brain MRI that same day showed no evidence for acute infarction, no structural abnormalities, and no abnormal enhancement or enhancing mass lesions. (Tr. 1000). On February

---

1. "FM" is "a commonly used medical abbreviation for fibromyalgia". *Privett v. Astrue*, 2008 WL 1771872, *4 (W.D. Va. 2008) ("Contrary to the ALJ's statement that there was 'no evidence supporting the claimant's allegations of fibromyalgia . . . [a doctor suspected and diagnosed] . . . 'FM' . . . after observing 'tender FM distribution.'").

8, 2010, Plaintiff presented to Dr. Roter, reporting medication significantly helped with her skin and rib pain, but she still experienced some leg shakiness. (Tr. 1069). She also reported increased fatigue, but said she was "starting to try" exercising. (Tr. 1069).

Between October 2009 and June 2010, Plaintiff saw Dr. Joseph Kousa numerous times to treat a number of conditions, including fibromyalgia. (Tr. 1078, 1082, 1085, 1091, 1095, 1101, 1107). However, his treatment records were not before the ALJ, and Plaintiff did not cite any of his records in her argument section or ask for them to be considered in a sentence six remand. (*See* Doc. 16, at 6–7 n.2–7). Therefore, the Court has not considered those records. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (stating the Court "is confined to review evidence that was available to the Secretary" and can only consider new evidence in certain circumstances). Likewise, the Court has not considered records that post-date the ALJ hearing.

On March 25, 2010, Plaintiff presented for a psychiatric evaluation, reporting symptoms of depression. (Tr. 1033, 1055). The notes document her history of incorrect diagnoses and state Plaintiff had recently been diagnosed with possible seizures and fibromyalgia. (Tr. 1033). Plaintiff reported she lost her last job because one of the managers told her she should stop taking her medication, as it was poisoning her, and when she took the manager's advice she became nonfunctional and was terminated in March 2007. (Tr. 1034). Plaintiff appeared to be of normal intelligence, could perform simple calculations without difficulty, and could recall two out of three objects after two minutes. (Tr. 1035). Plaintiff's cognition appeared intact. (Tr. 1035). Plaintiff was diagnosed with a mood disorder, not otherwise specified, and anxiety disorder. (Tr. 1035). During the session, Plaintiff's legs moved continually, and her memory was poor. (Tr. 1056). Plaintiff's

15

antidepressant medication was adjusted and she was referred to counseling. (Tr. 1036).

Consultative Examinations and RFC Assessments

*Dr. Eulogio R. Sioson – Physical Consultative Examination*

When Dr. Sioson examined Plaintiff on January 3, 2008, he found her joints, ability to grasp, manipulate, and pinch objects, and fine coordination normal. (Tr. 540, 543). He found no muscle spasms, clonus, primitive reflexes, or muscle atrophy. (Tr. 541). Dr. Sioson also determined Plaintiff has normal flexion, extension, and rotation in her spine. (Tr. 541). Plaintiff told Dr. Sioson she experiences balance problems, blurry vision, difficulty swallowing, aching, burning, tingling pains in her muscles, headaches several times a week, and lightheadedness. (Tr. 545). Plaintiff also told Dr. Sioson she can drive, do laundry and household chores, grocery shop, and attend to personal care, but drops things frequently and must take breaks due to fatigue. (Tr. 545). Dr. Sioson's report reflected Plaintiff's COPD diagnosis, stating she has a cough and wheezing several times a week and becomes short of breath walking and climbing stairs. (Tr. 545). He also noted the sharp pain in her chest, frequently reported in Plaintiff's medical records. (Tr. 545). Dr. Sioson reported Plaintiff's history of depression, also noting she feels tired constantly and experiences memory and concentration difficulties. (Tr. 545).

During the examination, Plaintiff walked normally but lost balance attempting tandem walking. (Tr. 546). She got up and down the exam table without assistance. (Tr. 546). Plaintiff had fair breath sounds, regular heart sounds, and a normal abdominal exam. (Tr. 546). Her extremities were also normal and she could grasp and manipulate with each hand. (Tr. 546). Plaintiff showed no neck or back tenderness; she was alert, coherent, oriented, and cooperative, with no abnormal behavior or appearance; and her manual muscle testing was normal with no sensory deficit, but she

did show some slow alternative hand movements and finger tapping, and lost balance on Romberg's test. (Tr. 546). Dr. Sioson's impression was MS, with mainly balance problems and no motor or sensory deficit, and no aphasia or dysphagia. (Tr. 546). He also found Plaintiff's lungs were clear and she was not short of breath either at rest or during office activities. (Tr. 546). Ultimately, he opined no objective findings would affect Plaintiff's work-related activities. (Tr. 546).

*Dr. Joseph Konieczny – Psychological Consultative Examination and RFC Assessment*

On January 18, 2008, consulting psychologist Dr. Konieczny evaluated Plaintiff. (Tr. 577). Plaintiff reported a lengthy and consistent work history until 2007. (Tr. 578). Plaintiff reported no psychiatric hospitalizations, and only brief outpatient counseling in 2002. (Tr. 578). Plaintiff showed no difficulties moving or walking, and showed no indication she experienced symptoms of acute physical discomfort. (Tr. 578). Plaintiff's described her overall level of energy and motivation as diminished. (Tr. 578–79). She was pleasant and cooperative, "seemed quite capable of expressing herself in a clear and coherent manner, maintained appropriate eye contact, and denied difficulties with sleep or appetite, though she reported feeling depressed. (Tr. 578). Plaintiff's ability to concentrate and attend to tasks showed no impairment. (Tr. 579).

Dr. Konieczny reported Plaintiff's "overall level of functioning is at a reduced level of efficiency." (Tr. 579). Plaintiff wakes around 7:00am, has coffee, and attends to hygiene, but only dresses if she plans to leave the house. (Tr. 579). She occasionally eats breakfast and generally spends the morning engaged in household chores and errands. (Tr. 579). Occasionally, she engages in volunteer work. (Tr. 579). Plaintiff completes more chores and errands after lunch and naps. (Tr. 579). Plaintiff socializes on the telephone with her family after supper, and watches television before going to bed around 9:00pm. (Tr. 579). She reported regular involvement in outside social activities

17

with friends. (Tr. 579). Plaintiff reported she drives minimally, does her own shopping, manages her finances, and holds credit cards in her name. (Tr. 579). Ultimately, Dr. Konieczny opined Plaintiff suffers depressive disorder, not otherwise specified. (Tr. 579). He found Plaintiff moderately impaired in her ability to withstand stress and pressure, listing her symptom-severity GAF as 54, but her functional-severity GAF as 68. (Tr. 580). Dr. Rivera reviewed Dr. Konieczny's evaluation and found Plaintiff's mental impairments not severe. (Tr. 583, 595).

*Dr. Maria Congbalay – Physical RFC Assessment*

Dr. Congbalay assessed Plaintiff's physical RFC on February 4, 2008, citing records showing Plaintiff's gait, muscle strength, bulk, and tone were normal, and she lacked numbness, pain, and weakness. (Tr. 598) She opined Plaintiff can lift 25 pounds frequently and 50 pounds occasionally; stand, walk, and sit for six hours in an eight-hour workday; and is unlimited in her ability to push and pull. (Tr. 598). Dr. Congbalay determined Plaintiff can frequently stoop, kneel, crouch, and crawl; can occasionally climb ramps and stairs and balance; and can never climb ladders, ropes, or scaffolds. (Tr. 599). She further found Plaintiff established no manipulative, visual, or communicative limitations. (Tr. 600–01). Dr. Congbalay opined Plaintiff should avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation, as well as moderate exposure to workplace hazards. (Tr. 601). Overall, she found Plaintiff partially credible. (Tr. 602).

*Dr. Porter – Treating Physician RFC Assessment*

On April 9, 2008, Dr. Porter described Plaintiff's condition after seeing Plaintiff on April 3, 2008. (Tr. 726, 728). She said Plaintiff had progressive, relapsing MS, increased weakness, spasticity, and cognitive impairment. (Tr. 726). She further stated a neurological exam showed Plaintiff was slow to respond, had clonus at both ankles, could not tandem walk, and had decreased

sensation. (Tr. 727). Dr. Porter explained Plaintiff's condition was deteriorating, further explaining Plaintiff was depressed, with slow cognitive responses, increased weakness, and blurry vision. (Tr. 727). Dr. Porter opined Plaintiff can stand for one hour in an eight-hour workday, for 15 minutes at a time. (Tr. 728). She stated Plaintiff can sit for four hours, for one hour at a time. (Tr. 728). According to Dr. Porter, Plaintiff can lift five pounds frequently or occasionally, but fatigues quickly. (Tr. 728). She found Plaintiff not significantly limited in her abilities to push and pull, handle objects, and speak. (Tr. 728). Dr. Porter found Plaintiff moderately limited in her abilities to bend, reach, and see. (Tr. 728). And Dr. Porter found Plaintiff extremely limited in her ability to perform repetitive foot movements. (Tr. 728).

Regarding Plaintiff's mental limitations and citing Dr. Floden's report, Dr. Porter found Plaintiff unlimited in social interaction or adaptation. (Tr. 729–30). She opined Plaintiff is moderately limited in a number of areas including completing a normal workday and workweek without interruptions from psychological symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 729–30). Further, Dr. Porter believed Plaintiff is markedly impaired in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; and be punctual within customary tolerances. (Tr. 729).

*Dr. Diane Manos – Physical RFC Assessment*

Dr. Manos's July 3, 2008 physical RFC assessment found Plaintiff can lift or carry 10 pounds frequently and 20 pounds occasionally. (Tr. 742). She also found Plaintiff can stand, walk, or sit for about six hours in an eight-hour workday, and is unlimited in pushing or pulling. (Tr. 742). Dr. Manos found Plaintiff can frequently stoop, kneel, crouch, and crawl; can occasionally climb

19

ramps and stairs and balance; and can never climb ladders, ropes, or scaffolds. (Tr. 743). Dr. Manos determined Plaintiff has no manipulative, visual, or communicative limitations, but should avoid moderate exposure to fumes, odors, dusts, gases or poor ventilation, and should avoid all exposure to hazards. (Tr. 744–45). Finding Plaintiff partially credible, Dr. Manos noted Plaintiff says she can stand for only five minutes, "yet she grocery shops." (Tr. 746). Ultimately, Dr. Manos concluded "[o]ther than balance issues [Plaintiff] has a fairly normal neuro exam." (Tr. 746, 748).

*Dr. Kutsikovich – Physical RFC Assessment*

On April 6, 2010, Dr. Kutsikovich opined Plaintiff can lift ten pounds ten percent of the day, and up to 20 pounds five percent of the day. (Tr. 1058–59). He believed she can bend, twist, turn, reach below her knees, push, pull, squat, and kneel less than five percent of the workday. (Tr. 1059). Dr. Kutsikovich found Plaintiff can stand and walk ten percent of the workday, and sit 40 percent of the workday. (Tr. 1059). He based these findings on diagnoses of cervical radiculopathy and partial seizure disorder, citing test results that indicated cervical radiculopathy. (Tr. 1059). He explained Plaintiff experiences sharp, sometimes constant pain, with exacerbations, and made worse by motion. (Tr. 1059). Dr. Kutsikovich also said Plaintiff must avoid climate extremes and chemicals, along with heights and machinery, but said she has no difficulty concentrating. (Tr. 1060). He found it unlikely she could sustain employment for an entire workday and workweek. (Tr. 1060).

*Third Party Function Reports*

Plaintiff's mother submitted a statement explaining Plaintiff worked continuously from the time she was 14 until her abilities decreased due to MS. (Tr. 182). She also described MS flares and Plaintiff's continued effort to maintain her functional level. (Tr. 182). Plaintiff's mother spoke to

the gradual deterioration she saw in her daughter's condition, turning her from a hard-working individual to someone who cannot function in a work setting. (Tr. 182). Plaintiff's friend and former coworker Shannon Bish also described Plaintiff's deterioration, stating she had more bad days over time and could not concentrate on work or finish tasks. (Tr. 183). Ms. Bish described Plaintiff as an independent person who simply could not work anymore, explaining Plaintiff has difficulty with household tasks, and also reporting she noticed tremors in Plaintiff's hands and legs. (Tr. 183). A resident of the housing facility Plaintiff managed described Plaintiff's deterioration as well, stating can no longer multitask, is easily fatigued, does not deal well with stress, has memory difficulty, and experiences muscle spasms. (Tr. 185).

<u>Vocational History</u>

Plaintiff completed high school and participated in some adult education. (Tr. 164, 577). Her past work included management positions at various employers, and she generally worked a 40 hour workweek. (Tr. 161). From August 2000 until March 20, 2007, Plaintiff worked as an office manager (Tr. 201), but she inconsistently reported the reason for her termination. In Plaintiff's function report, she stated she was terminated due to "[i]rrational behavior of the managing agent, le[ading] to the firing of the entire staff" (Tr. 179), and she reiterated this story to her physical and occupational therapists (Tr. 628, 633). But Plaintiff's story differed at the ALJ hearing, where she testified her manager terminated her because "the medication and stuff that [she] was taking wasn't good for [her] because it changed [her]" to the point Plaintiff could not perform her job. (Tr. 37, 39–40). In a letter dated January 2010, Plaintiff clarified her manager "treated [her] as though [she] was contagious and continually pushed [her] to stop the medications because she felt the medicine was poisoning [Plaintiff]." (Tr. 202; *see also* Tr. 1038, 1040).

ALJ Hearing

Plaintiff was represented by counsel at the ALJ hearing on May 11, 2010. (Tr. 35). She testified, as did a medical expert and VE. (Tr. 35). Plaintiff testified she managed a senior facility under the Department of Housing and Urban Development for seven years. (Tr. 37). While there, she received superior work ratings, made a good salary, and enjoyed her job. (Tr. 37). After 2005, Plaintiff testified her work performance started deteriorating due to her condition. (Tr. 39). She could no longer multitask and had concentration difficulties. (Tr. 39–40). Plaintiff testified she lost her job March 20, 2007 because she could no longer perform the work. (Tr. 36). She explained her boss said Plaintiff's  medication changed her to the point she could not do her job. (Tr. 37).

Plaintiff lives in a house with her mother. (Tr. 43). She testified that on a daily basis, she gets up, dresses, and does some housework, but sleeps a lot. (Tr. 38). The ALJ questioned Plaintiff about the difficulty diagnosing her neurological issues, detailing the incorrect MS and myasthenia gravis diagnoses. (Tr. 38). Plaintiff also testified she had been diagnosed with fibromyalgia and seizures. (Tr. 38, 41). Plaintiff testified her symptoms include depression, weakness, fatigue, skin pain, leg cramping, and rib cage pain. (Tr. 42). Plaintiff also noted she falls frequently, suffers confusion and balance problems, and experiences concentration, comprehension, and memory difficulties. (Tr. 43–44, 48, 50). Plaintiff testified she has to write things down to remember them and finds herself rereading things without comprehending. (Tr. 48). On Plaintiff's good days, which she testified occur approximately twice a week, she can use the stairs without worrying about falling, do the laundry, and even mow the lawn every once in a while. (Tr. 45–46). She testified she "can do pretty much everything" as far as household chores are concerned, but must take breaks at times. (Tr.

47–48). Plaintiff's mother helps her with chores and stairs. (Tr. 49). Plaintiff also testified she has difficulty gripping items and drops things. (Tr. 49). On her bad days, she watches television and sleeps all day. (Tr. 46). Plaintiff testified she has tried unsuccessfully to find work. (Tr. 50).

The medical expert testified Plaintiff has non-convulsive seizures, COPD, obstructive sleep apnea, and depressive disorder not otherwise specified, but her conditions do not meet or medically equal a listing. (Tr. 50–51). He found her RFC is not subject to exertional limitations, but she can never climb ladders, ropes, or scaffolds; must avoid concentrated fumes, dangerous machinery, unprotected heights, and driving; and cannot work in a job requiring high production quotas. (Tr. 51). The medical expert disagreed with Dr. Porter's and Dr. Kutsikovich's assessments of Plaintiff's limitations, finding them highly inconsistent with the medical records, including the doctors' own records. (Tr. 55–56).

The VE described Plaintiff's past relevant work as "housing project manager", a sedentary skilled position with no transferrable skills. (Tr. 59–60). The ALJ posed two hypotheticals to the VE. First, he asked the VE to consider a person of Plaintiff's age, education, and work background with the following limitations: The person could stand, walk, and sit six out of eight hours, with no limitations on pushing, pulling, or foot pedaling; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; with no manipulative, visual, or communicative limitations. (Tr. 60). Further, the person should avoid driving, unprotected heights, workplace hazards, and high concentrations of smoke, fumes, dust, and pollutants, and should do low-stress work with no high production quotas or piece work. (Tr. 60). The VE testified this would rule out Plaintiff's past work, but such a person could still perform the jobs of housekeeper cleaner (light work; 400,000 jobs nationally; 20,000 in Ohio), food service

worker (light work; 130,000 jobs nationally; 8,000 in Ohio), and laundry laborer (medium work; 50,000 jobs nationally; 2,000 in Ohio). (Tr. 61).

The only difference in the second hypothetical was the person could lift and carry 20 pounds occasionally and ten pounds frequently. (Tr. 61). The VE testified two of the previously identified positions would still apply and added a position – vending attendant (light work; 200,000 jobs nationally; 10,000 in Ohio). (Tr. 61–62). The VE then testified a person should be able to perform sedentary work if she can perform light work. (Tr. 62). Plaintiff's attorney asked the VE to consider the ALJ's second hypothetical, with the additional limitation that the person would be off-task up to three hours per day, and the VE testified such a person could not perform any work. (Tr. 63). Additionally, the VE testified a person would not be able to work if they missed work so frequently that it was "above the minimal tolerance level of any employer." (Tr. 64).

ALJ Decision

The ALJ found Plaintiff's date last insured to be December 31, 2012, and determined she has not engaged in substantial gainful activity since her alleged onset date. (Tr. 20). He found she suffers three severe impairments – depressive disorder not otherwise specified; non-convulsive seizure disorder; and COPD – but these impairments do not meet or medically equal a listing. (Tr. 20). The ALJ determined Plaintiff has the RFC to perform work at all exertional levels, with the following nonexertional limitations:

> she can occasionally climb a ramp or stairs, but never a ladder, rope or scaffold; can frequently balance, stoop, kneel, crouch and crawl; should avoid driving, unprotected heights, workplace hazards, high concentrations of smoke, fumes, dust and pollutants and should do low stress work, no high production quotas and no piece rate work.

(Tr. 22). The ALJ discussed Plaintiff's daily activities, finding her statements about her symptoms not credible because though she frequently complained of pain, diagnostic testing was inconclusive

24

and often negative, and examinations were frequently normal. (Tr. 22–23). The ALJ also stated while an EMG revealed cervical radiculopathy, a subsequent examination was normal. (Tr. 24).

The ALJ agreed with the medical expert and gave great weight to his testimony, giving limited weight to Dr. Porter's and Dr. Kutsikovich's opinions, as he found documentation did not support their conclusions. (Tr. 25). The ALJ gave great weight to Dr. Sioson's findings, giving limited weight to the consultant opinions limiting Plaintiff to medium or light work based on the subsequently-ruled-out MS diagnosis. (Tr. 25). Because Dr. Floden's documentation showed cognitive decline, the ALJ gave minimal weight or no weight to the opinions stating Plaintiff has no severe mental impairment and is not impaired in concentration and attention. (Tr. 25–26). After finding Plaintiff could not perform her past relevant work, the ALJ found, based on VE testimony, Plaintiff could perform jobs existing in significant numbers in the national economy. (Tr. 26). Therefore, he found her "not disabled." (Tr. 27). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was the claimant engaged in a substantial gainful activity?
>
> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can she perform past relevant work?
>
> 5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges four assignments of error (*see* Doc. 16), but two of these deal with the treating physician rule and are examined together. Additionally, Plaintiff contends the ALJ erred by failing to address Plaintiff's diagnosis, treatment, and symptoms of cervical radiculopathy and fibromyalgia at step two of the sequential evaluation. (Doc. 16, at 21–23). Finally, Plaintiff argues substantial evidence does not support the ALJ's RFC finding. (Doc. 16, at 23–25).

Treating Physician Rule

Plaintiff argues the ALJ erred by failing to give proper weight to the opinions of Dr. Porter and Dr. Kutsikovich. (Doc. 16, at 15–21). She first argues the ALJ should have afforded these treating physician opinions controlling weight, also arguing the ALJ should at least have given them great weight and failed to give good reasons explaining the limited weight he assigned them.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers*, 486 F.3d at 242; *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed,

27

longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference". *Id.* Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). The "good reasons" an ALJ gives to discount a treating source's opinion must be "supported by the evidence in the case record". *Id.* at 406–07 (quoting SSR 96-2p, 1996 WL 374188, at *5). Failing to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243).

*Dr. Porter*

The ALJ did not err assessing Dr. Porter's opinion. Her opinion is not entitled to controlling weight because it is inconsistent with substantial evidence and with medically acceptable clinical and diagnostic techniques. Further, the ALJ gave good reasons for assigning it limited weight when he said "[t]he evidence does not support Dr. Porter's . . . opined limitations". (Tr. 25). Dr. Porter's highly restrictive assessment of Plaintiff's limitations is inconsistent with her own and other medical records. When Dr. Porter completed her forms in April 2008, she based her opinion at least in part

28

on Plaintiff's progressive and relapsing MS (Tr. 726), but that diagnosis was ruled out and by November 2008, Dr. Rubin concluded Plaintiff had no evidence of neurological disease (Tr. 943). Dr. Porter found Plaintiff can stand for only one hour, sit for only four hours, lift up to five pounds but fatigues quickly, is moderately limited in bending, reaching, and seeing, and is extremely limited in performing repetitive foot movements (Tr. 728), but the medical evidence simply does not support this degree of limitation.

In the period relevant to Plaintiff's alleged disability, she first saw Dr. Porter over two years after being diagnosed with MS, and though her gait wavered a little, she climbed onto the exam table without assistance. (Tr. 569–70). The same month, despite complaints of fatigue, weakness, confusion, rib pain, and exhibiting balance problems, Plaintiff's gait and strength were normal. (Tr. 639, 641). And though her deep tendon reflexes were mildly brisk with clonus in both ankles and she experienced decreased sensation on one leg, her difficulties were "mild sensory abnormalities." (Tr. 641–42). The next time Plaintiff saw Dr. Porter, she reported doing much better. (Tr. 562).

When Plaintiff began physical therapy, she had mild coordination impairment, a mildly unstable gait, poor righting reactions, and decreased balance. (Tr. 635–36). Later notes indicate improvement, showing no imbalance or loss of balance in a number of gait tests (Tr. 610), and at her final appointment Plaintiff ambulated independently with a mildly unstable gait, completed tandem and toe walking, and completed heel walking despite difficulties. (Tr. 1026, 1028). Despite reporting numerous symptoms at occupational therapy, Plaintiff was independent in meal preparation, cleaning, laundry, and money management, though she needed rest breaks for some activities. (Tr. 628). Her range of motion and strength were normal, and a driving test showed while she should not drive on bad days, she could otherwise drive independently without restrictions. (Tr.

29

616–19, 629).

Plaintiff continued to see Dr. Porter in March 2008, reporting ringing in her ears and hearing a whooshing sound, along with shaky legs (Tr. 558–59), but though she still had some balance difficulties, she could walk on a level surface with no assistive device, no imbalance, and a normal gait. (Tr. 552–53). In April 2008, just before Dr. Porter issued her opinion, Plaintiff told Dr. Porter her relief after steroid infusions only lasted a few days, but she presented in no acute distress, and her extremities were normal other than her thighs, which were tender to the touch. (Tr. 549). When Plaintiff saw Dr. Rensel the first time, she walked independently and had full strength in all her extremities (sometimes limited by pain), but did have some balance problems. (Tr. 1023–24).

Though Dr. Porter's assessment indicated Plaintiff could not perform tandem walking (Tr. 727), physical therapy notes from later the same month indicate she could do this (Tr. 1028). And although Plaintiff continued to report problems to Dr. Porter and she still had some reflex problems with clonus at both ankles (Tr. 966), neurologist Dr. Rubin ultimately ruled out MS, finding Plaintiff's exam was mostly normal, with signs of embellishment. (Tr. 961). At a later appointment with Dr. Rubin, Plaintiff denied limb weakness and showed full shoulder strength, with no decay over repetitive testing. (Tr. 948). Despite an EMG showing cervical radiculopathy, a later neuromusculoskeletal examination was normal, and Plaintiff even told one doctor she was exercising. (Tr. 1064, 1066, 1069–70).

All in all, the medical record shows while Plaintiff complained of pain, shakiness, fatigue, and weakness, her physical examinations were mostly normal. Though she did have some balance problems, she generally had no gait problems, full strength, only mildly brisk reflexes, and mild sensory abnormalities. Further, Plaintiff showed no range of motion difficulties, no neck or back

30

tenderness, normal muscle testing, and no motor or sensory deficit at the consultative examination, further reporting she could accomplish most activities of daily living. (Tr. 540–41, 545–46). Dr. Floden's report showed some evidence of cognitive decline (Tr. 659), somewhat consistent with Dr. Porter's opinion that Plaintiff experiences mental limitations (Tr. 729–30). The ALJ apparently gave some weight to this, as he ignored the opinions stating Plaintiff has no severe mental impairments (Tr. 583) and incorporated mental limitations into the RFC determination (Tr. 22). But as to the rest of Dr. Porter's opinion, the record as a whole does not support her conclusions. To the contrary, records show Plaintiff has normal strength, gait, and range of motion, can accomplish activities of daily living without significant difficulty, and can even exercise. As the ALJ said, Dr. Porter's opinion is highly inconsistent with the medical evidence. Thus, he gave good reasons for the weight he assigned the opinion and did not err.

*Dr. Kutsikovich*

Likewise, the ALJ did not err in assessing Dr. Kutsikovich's opinion. His extremely limited opinion of Plaintiff's functional level is inconsistent with substantial evidence and medically acceptable clinical and diagnostic techniques, and the ALJ gave good reasons for the weight he assigned it – namely, he accurately stated no documentation supports the degree of limitation imposed on Plaintiff's functioning. (Tr. 24).

Dr. Kutsikovich's own records are inconsistent with the extreme limitations he placed on Plaintiff. He opined Plaintiff can lift ten pounds ten percent of the day and 20 pounds five percent of the day (Tr. 1058–59), but his examination showed Plaintiff's twitching episodes improved on medication, her motor strength was normal, and she had normal muscle bulk and tone. (Tr. 1064). Though an EMG showed cervical radiculopathy (Tr. 1066), subsequent neuromusculoskeletal

evaluation was normal (Tr. 1064). He found she can stand and walk only ten percent of the day (Tr. 1059), despite his examination showing she had a normal gait, normal strength, and no coordination problems (Tr. 1064). Further, Plaintiff's other medical records are inconsistent with Dr. Kutsikovich's opinion. In April 2007, she had no problems walking, no neck or back pains, no radicular symptoms, no numbness or weakness, and no headaches, along with normal strength, gait, and coordination. (Tr. 229–30). Though Plaintiff's gait was wavered a little in January 2008, she climbed onto the exam table without assistance. (Tr. 570).

Plaintiff's examinations were consistently normal (*see, e.g.,* Tr. 641–42, 948, 1023–24), and after physical therapy her gait showed only mild instability, a normal gait pattern, and normal stride length, despite her continued balance issues (Tr. 607, 610, 1028). As already discussed, Plaintiff's January 2008 consultative was overwhelmingly normal, and Plaintiff told one physician she was exercising. (Tr. 546, 1070). A July 2008 MRI showed cervical spine disc osteophyte changes (Tr. 842), but an examination in August 2008 showed that Plaintiff's exam was normal, apart from "briskish lower extremity reflexes and inconsistent sensory findings", Plaintiff showed signs of embellishment, and neurologist Dr. Rubin believed Plaintiff was a somaticizer with "a kernel of pathology to her symptoms that she embellished". (Tr. 961). Simply put, the vast majority of this medical evidence shows normal examination and does not support Dr. Kutsikovich's highly limited opinion regarding Plaintiff's ability to function. Instead, these findings throughout the years and their inconsistency with Dr. Kutsikovich's opinion provide good reasons for the ALJ assigning limited weight to his opinion. The ALJ was correct: Documentation does not support Dr. Kutsikovich's opinion, and substantial evidence supports assigning it limited weight.

<u>Severe Impairments</u>

Plaintiff's next argument stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184,  at *5) (emphasis in original). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Here, Plaintiff alleges the ALJ erred "by failing to address [Plaintiff's] diagnosis, treatment, and symptoms of cervical radiculopathy and fibromyalgia at step two", further arguing substantial evidence does not support finding these impairments are not severe. (Doc. 16, at 22).

*Cervical Radiculopathy*

The ALJ did not discuss Plaintiff's cervical radiculopathy diagnosis in his step two analysis. (*See* Tr. 20). However, he did discuss the diagnosis during his step four RFC determination. (Tr. 24). Specifically, the ALJ noted the October 2009 EMG revealing mild to moderate cervical

33

radiculopathy. (Tr. 24). He also mentioned that a subsequent examination was normal, and cited Dr. Sioson's consultative examination finding no neck or back tenderness, no motor sensory deficit, and neuromusculoskeletal data showing no objective finding that would affect work-related activities. (Tr. 23–24). Discussing Dr. Kutsikovich's opinion, which was based in part on the cervical radiculopathy diagnosis, the ALJ found that though Dr. Kutsikovich "indicated [Plaintiff] has neck and shoulder pain . . . there is no explanation regarding limitations he imposed on sitting, standing, walking or even the degree of lifting and carrying". (Tr. 24).

Plaintiff's test results did indicate cervical spine problems, including cervical radiculopathy, several times, and Dr. Kutsikovich listed it as a diagnosis. (*See* Tr. 491, 504, 509, 1059, 1066). However, on other occasions – admittedly preceding the October 2009 EMG – a spine x-ray showed only minimal scoliosis (Tr. 284–86), Plaintiff reported no neck or back pain, no radicular symptoms, and no numbness or weakness (Tr. 229), and Dr. Sioson's consultative exam found a normal cervical spine range of motion (Tr. 541). Additionally, when Dr. Kutsikovich evaluated Plaintiff in December 2009, she had normal strength, reflexes, sensation, and coordination. (Tr. 1064).

Though Dr. Kutsikovich stated Plaintiff suffers cervical radiculopathy (Tr. 1059), "the mere diagnosis of an impairment does not indicate the severity of that impairment." *Mikesell v. Astrue*, 2012 WL 1288733 , *adopted by* 2012 WL 1288724 (N.D. Ohio 2012) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)). Here, the ALJ must have been aware of Plaintiff's cervical radiculopathy diagnosis because he considered Dr. Kutsikovich's opinion and discussed Plaintiff's cervical spine test results, including the EMG showing cervical radiculopathy. (Tr. 23–25). The ALJ also discussed Plaintiff's daily activities, noting on a better day she is more active

and can even take out the lawn mower. (Tr. 22).When Plaintiff testified, she said she "can do pretty much everything" with household chores, though it sometimes takes her longer. (Tr. 47).

Ultimately, the ALJ determined substantial evidence did not show these symptoms were severe or limited Plaintiff's ability to perform work activities. Given often-negative diagnostic testing – including spine x-rays; an appointment where she reported no neck or back pains and had no radicular symptoms; a consultative exam where Plaintiff had no neck or back tenderness and normal neuromuskuloskeletal data; and normal strength, reflexes, and sensation after the abnormal EMG, substantial evidence supports the ALJ's decision not to include limitations related to cervical radiculopathy in his RFC determination. And because he discussed the impairment at subsequent steps, the failure to find it a severe impairment at step two does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz*, 837 F.2d at 244).

*Fibromyalgia*

The ALJ did not discuss fibromyalgia in his step two analysis. (*See* Tr. 20). Indeed, he did not mention fibromyalgia once in his entire decision. Although fibromyalgia patients present no objectively alarming signs, fibromyalgia can be a severe impairment. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). It is an "elusive" and "mysterious disease" which causes severe musculoskeletal pain, and objective tests are of little relevance in determining the condition's existence or severity because fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion." *Id.* at 243–44 (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003)). Diagnosing fibromyalgia includes two steps: (1) testing a series of focal points for tenderness and (2) ruling out other possible conditions through objective

medical and clinical trials. *Rogers*, 486 F.3d at 244.

Defendant contends the ALJ had no evidence fibromyalgia was one of Plaintiff's medically determinable impairments when he made his decision, arguing Plaintiff was not diagnosed with the condition until January 2010 and those records were only submitted to the Appeals Council. (Doc. 17, at 22). However, this simply is not accurate. It is true the ALJ did not see any of Dr. Kousa's records documenting Plaintiff's treatment for and symptoms of fibromyalgia (*see* Tr. 1077–1117), but the ALJ had other evidence of fibromyalgia before him, including Plaintiff's testimony about her diagnosis and symptoms (Tr. 41–42), a doctor's record reporting Plaintiff had fibromyalgia tender points, that doctor's conclusion that "FM appears to play a role" (Tr. 1071), and psychiatric evaluation notes indicating Plaintiff had recently been diagnosed with fibromyalgia (Tr. 1033, 1035). In fact, the ALJ specifically asked Plaintiff, "And you were also diagnosed at some point with fibromyalgia, right?", and Plaintiff testified to weakness, fatigue, general pain, and skin pain. (Tr. 41–42). The ALJ was also aware, through testimony and numerous medical records, of the long history of physicians ruling out causes for Plaintiff's neurological symptoms. Between a medical record documenting tender focal points, years of ruling out other neurological causes, and Plaintiff's testimony regarding fibromyalgia, the ALJ should have been aware fibromyalgia was an issue in Plaintiff's case; yet, he neglected to mention it at any stage of the sequential evaluation.

When an ALJ fails to find an impairment severe, courts affirm if the rest of the opinion makes clear he considered all the plaintiff's symptoms and conditions through the rest of the sequential evaluation. *See, e.g., Mikesell*, 2012 WL 1288733 at *11 (finding the ALJ "thoroughly discussed" evidence relating to pain and difficulty walking attributed to fibromyalgia); *Underwood v. Comm'r of Soc. Sec.*, 2012 WL 511732, *5 (N.D. Ohio 2012) (finding the ALJ did not err

"because he took into account the effect Plaintiff's pain and mental impairments had on her RFC.");
*Smith v. Comm'r of Soc. Sec.*, 2012 WL 1004670, *3 (N.D. Ohio 2012), *adopted by* 2012 WL
1004660 (finding that "[d]uring the ALJ's consideration of Smith's impairments at the latter stages,
the ALJ considered both Smith's severe and non-severe impairments . . . [and] Plaintiff's RFC
included a detailed overview of Smith's history of back, hip and leg pain."); *Clowser v. Astrue*, 2011
WL 2490873, *6–7 (N.D. Ohio 2011) (finding the ALJ considered the cumulative effect of all the
plaintiff's impairments, including non-severe mental impairments). In at least one instance, the
district court affirmed even where the ALJ did not specifically mention a condition, because the
court determined he was aware of the diagnosis based on the consideration and weight he assigned
to various physician opinions. *Lariccia v. Comm'r of Soc. Sec.*, 2012 WL 3150856, *12–13 (N.D.
Ohio 2012), *appeal docketed* No. 12-4198 (6th Cir. Oct. 11, 2012) ("It is clear to the Court that the
ALJ was aware of the diagnosis and considered it in his RFC analysis because the ALJ explicitly
evaluated the opinions which addressed this condition.").

On the other hand, where an ALJ's opinion does not make it apparent whether he considered
an impairment at all, courts remand. *See, e.g., Oaks v. Astrue*, 2012 WL 646152, *11–12 (N.D. Ohio
2012), *adopted by* 2012 WL 646211 ("[T]he ALJ's analysis d[id] not provide any firm indication
that she accounted for Oaks' diabetes and neuropathy in assigning his RFC" and "her failure . . . to
even acknowledge the change in Oaks' condition or discuss the medical evidence relative to his
diabetes and peripheral neuropathy was clear error."); *Sutkaytis-Salka v. Comm'r of Soc. Sec.*, 2012
WL 130876, *6 (N.D. Ohio 2012) (Though the court did not thoroughly evaluate the step two
argument because it remanded on other grounds, the court instructed the ALJ to consider whether
an additional impairment was severe or impacted the plaintiff's ability to work because it was "not

37

apparent whether the ALJ considered Plaintiff's degenerative disc disease at all.").

Additionally, "courts have remanded where there is at least some, albeit minimal, evidence of [fibromyalgia] in the record." *Silva v. Comm'r of Soc. Sec.*, 2011 WL 3472296, *6 (N.D. Ohio 2011) (citing *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 860 (6th Cir. 2011); *Preston*, 854 F.2d at 815). In *Kalmbach*, despite the plaintiff listing fibromyalgia as a reason for her disability and numerous medical records detailing her treatment for the condition, "the ALJ . . . neither identified it as a severe impairment nor explained why he believed it was not one." *Kalmbach*, 409 F. App'x at 853–55, 859. Where "the record is replete" with objective evidence supporting a fibromyalgia diagnosis, an ALJ's failure to consider the limitations the condition imposes is reversible error. *Patterson v. Astrue*, 2010 WL 2232309, *12 (N.D. Ohio 2010); *see also Rogers*, 486 F.3d at 244 (medical evidence was "replete" with references to tender points in a classic fibromyalgia distribution); *Swain*, 297 F. Supp.2d at 993 (remanding where medical records showed 18 of 18 fibromyalgia trigger points, pain in the plaintiff's entire body, and a history of unsuccessful treatment for fibromyalgia). A court will not remand, though, if the plaintiff's self-reported medical history provides the only evidence of the condition. *Silva*, 2011 WL 3472296 at *9.

In Plaintiff's case, the Court should find it is entirely unclear whether the ALJ considered fibromyalgia as a potential medically determinable impairment, as the opinion he issued makes absolutely no reference to the condition. Further, unlike in *Lariccia*, here it is not clear the ALJ considered the impairment implicitly through considering the medical opinions at issue, because none of the medical opinions regarding Plaintiff's functional limitations spoke to fibromyalgia. Here, Plaintiff has shown more evidence of fibromyalgia than the mere self-reported medical history at issue in *Silva*. Medical records before the ALJ noted Plaintiff's tender points, consistent with

fibromyalgia, and her lengthy medical history of ruling out other neurological diagnoses also lends itself toward a fibromyalgia diagnosis. At the hearing, the ALJ appeared to recognize Plaintiff had been diagnosed with fibromyalgia, stating, "And you were also diagnosed at some point with fibromyalgia, right?" (Tr. 41). Furthermore, Plaintiff testified to body pain, fatigue, and skin pain (Tr. 42), and these complaints also appeared frequently in her medical records (*see, e.g.,* Tr. 545, 571, 639, 658, 760, 933–34, 942, 948, 966, 1008, 1022–24, 1026, 1039, 1070–71).

While a mere diagnosis of a condition is not enough to prove its severity, *see Mikesell*, 2012 WL 1288733 at *9, here the ALJ had a medical record indicating the diagnosis, testimony regarding the diagnosis, a history of symptoms, and other potential explanations for the symptoms ruled out over time. Considering all those factors, and given the ALJ's failure to address fibromyalgia at all – even to find it did *not* limit Plaintiff or to find her complaints not credible – it is impossible to tell whether he actually considered the impairment. The Court cannot trace his reasoning for not including any limitations from fibromyalgia in his RFC determination, and therefore the Court should remand this case for the ALJ to explain how he considered the condition and what limitations, if any, it imposes on Plaintiff's ability to perform work activities.

Substantial Evidence Supporting RFC

RFC is a measurement of the most a plaintiff can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It represents "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting" for eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, *1. The RFC assessment must be based on all relevant evidence, "such as medical history, medical signs and laboratory findings, the effects of treatment . . . , reports of daily activities, lay evidence, recorded observations, medical

source statements, effects of symptoms, including pain . . . , evidence from attempts to work, need for a structured living environment, and work evaluations, if available." *Id.* at *5. Plaintiff alleges the ALJ improperly considered or failed to consider Plaintiff's medical history, daily activities, lay witness reports, treating source medical statements, and reports of symptoms. (Doc. 16, at 24).

In his RFC discussion, the ALJ extensively summarized and considered most of Plaintiff's medical history, documenting treatment notes and test results from Plaintiff's treating, examining, and consultative physicians. (*See* Tr. 22–26). This Report and Recommendation has discussed his assessment of Dr. Porter's and Dr. Kutsikovich's opinions at length , concluding substantial evidence supports the weight he assigned those opinions. Further, the ALJ considered Plaintiff's daily activities multiple times, finding she attends to morning hygiene, performs household chores and errands, does her own shopping, and takes out the lawn mower on a good day. (Tr. 21–22). By discussing Plaintiff's testimony and the medical evidence – including Plaintiff's numerous complaints – the ALJ considered her reports of symptoms and their effects on her life. (Tr. 22–26).

There is a problem with the ALJ's RFC determination, however. The ALJ did not, in fact, consider Plaintiff's entire medical history, and he did not consider all potential functional limitations. As discussed above, the ALJ omitted any reference to or discussion of Plaintiff's fibromyalgia diagnosis and failed to consider what if any impact the disorder might have on her RFC. Though he may not ultimately change his RFC determination after considering the impact of fibromyalgia, under these circumstances the ALJ was required to provide sufficient analysis indicating his RFC determination accounted for all Plaintiff's impairments. *See Oaks*, 2012 WL 646152 at *11 n.7. The Court should remand for the ALJ to appropriately explain his RFC determination.

The ALJ also did not discuss the third party function reports submitted by Plaintiff's friends and family, and Plaintiff argues this was error.(Doc. 16, at 24; Doc. 18, at 9). It is true SSR 96-8p instructs ALJs to assess RFC based on all relevant evidence, such as lay evidence, and that the ALJ cannot pick and choose only the evidence supporting his opinion. 1996 WL 374184 at *5; *Hopkins v. Comm'r of Soc. Sec.*, 2009 WL 1360222, at *14 (S.D. Ohio 2009). But SSR 06-03p, which explains how to consider opinions from people other than acceptable medical sources, states simply that an ALJ "*may* use evidence from 'other sources'" to show an individual's impairment severity, including reports from family and friends. 2006 WL 2329939, at *2 (emphasis added). The weight given to lay evidence varies based on a number of factors, and when considering evidence from family and friends, it is appropriate to consider the relationship, whether the source's opinion is consistent with other evidence, and any other factors that support or refute the opinion. *Id.* at *6.

Though SSR 06-03p states the case record should reflect the consideration of opinions from non-medical sources who see the plaintiff in their professional capacity and medical sources other than "acceptable medical sources", the ruling has no similar instruction for the case record to reflect the weight given opinions from family and friends. *See id.* Further, "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party". *Laddy v. Astrue*, 2012 WL 776551, *14 (N.D. Ohio 2012), *adopted by* 2012 WL 777137 (finding the plaintiff's contention the ALJ erred by failing to discuss and explain the weight she gave third-party reports lacked merit). Thus, here the ALJ did not err by failing to discuss and explain the weight he assigned the third party reports, which largely echoed Plaintiff's own reports and were largely inconsistent with the medical evidence and Plaintiff's daily activities. That said, because remand is proper on other grounds, "it would impose no additional burden on the ALJ to expressly

address" this issue on. *See Gerhart v. Comm'r of Soc. Sec.*, 2012 WL 1068986, *8 (N.D. Ohio 2012).

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds substantial evidence does not support the Commissioner's decision denying SSI and DIB benefits to the extent the ALJ failed to analyze what impact, if any, Plaintiff's fibromyalgia has on her RFC. The undersigned therefore recommends the Commissioner's decision be reversed and remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

s/James R. Knepp, II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).